Barnard, P. J.
The plaintiff and Frederick L. Whiton were partners in the business of manufacturing paints from 1857 to the early part of February, 1870, when the partnership was terminated by the death of Whiton. By the articles of co-partnership, and the agreements subsequent to the foundation of the same which modified it, the sur *699 viving partner had the right to take the business under certain conditions specified in these agreements. An action was commenced by the executor of the deceased partner to procure a settlement of the accounts of the firm, and for a settlement of the terms of the performance of the covenants in respect to the purchase by the surviving partner. This action was at issue, and was then submitted to an arbitrator. The arbitrator made his award in favor of the executor of the deceased partner to a large amount.
The plaintiff by this action seeks either to stay the execution of the award or to get a new trial, both because the arbitrator exceeded his powers which would be a good cause for relief under Halstead v. Seaman (82 N. Y., 27), and because he was unfair, partial and unjust in his decision, which facts are to be assumed because the decision itself was wrong, and, therefore, unjust and partial.
The charge that the arbitrator exceeded his powers is based mainly upon his award charging the surviving partner with a sum of §10,000, entered on the half-yearly account of January 1, 1870, for depreciation in the machinery of the firm. No such item has been included in previous accounts. Whiton was then very sick, and, in fact, died ■on the 20th of February, 1870. He was in South Carolina, and there was and is no proof that he ever knew of the charge. The executor was at the place of business and knew of the charge, but supposed it would be either approved or disapproved by his brother. The articles of agreement bind the surviving partner as purchaser, to pay the cost of the machinery as shown by the books of the firm. The money to be paid the executor depended in some manner upon the $10,000 in the account of. January, 1870, being a stated account, one which bound the estate of the deceased. The proof makes it a fair and even necessary inference that the deceased was not bound by it. It was not the custom of this firm to make the entry yearly whatever may have been the custom of other firms. The cost of the machinery as really paid was an important figure to retain, and it was retained until the deceased was helpless and dying, and then a lump sum was inserted in the account which was to benefit the survivor. The item it seems to me was open for the arbitrator to pass upon, and his conclusion was right as being based upon a course of business which was not proven to have been altered. It was not a stated account under the evidence. An examination of the other items seems to fairly support the arbitrator, assuming error in conclusion to be basis of fraud. By the agreements the surviving partner was to take the merchandise at the purchaseable wholesale market price of the goods. The surviving partner inventoried them at cost. The arbitrator *700 allowed to the deceased the difference which was according to the agreement.
A man named Titterton gave a mortgage to the surviving executor to cover a debt due the firm. It is a question of fact whether the executor held the mortgage in absolute ownership or for the partnership. The arbitrator held that it belonged to the firm.
In respect to the interest upon payments the arbitrator seems to be clearly right. The surviving partner might have retained all the money until the principal matured. He made payments before the time. There seems to be no principal of equity which will, as matter of law, allow interest on a payment made in advance of the maturity of the debt. It is not according to custom. The money could not be recovered back. The award, in all its parts, was within the submission, and the conclusion under the evidence cannot be made the subject of review upon its merits. The Morris Run Coal Co. v. Salt Co., 58 N. Y., 667; Perkins v. Giles, 50 N. Y., 228.
The judgment should be affirmed, with costs.
Dykman, J., concurs.
Pratt, J.
Appeal from a judgment refusing to set aside an award by which plaintiff was found indebted to defendant for half the following sums, with interest, in settling the partnership affairs of Masury & Whiton: $10,000 charged to profit and loss, December 31, 1869, for wear and tear of machinery; $15,901.02 for-alleged undervaluation of merchandise, $10,000 for deficiency in the Titterton mortgage. The defendant had judgment for the aggregate of these sums and interest, besides expenses of the arbitration, on a counter-claim based on the award. The submission was by written stipulation of “all matters involved” in an action then pending. The arbitrator seems to have erroneously supposed that “all differences” between the parties relating to “a final settlement of the partnership affairs of the firm” were submitted to him. He thus inaccurately recites the terms of the submission in his award. The learned trial judge assumed that all transactions of the firm were involved in the old action simply because it was “for an accounting.” I think he erred in this respect for the following reasons: The duties of the partners were fixed by thrée written agreements which were attached to and made a part of the old complaint. They provide for annual or more frequent accountings, which should be full and complete. It seems that accountings occurred every six months. In alleging default in rendering accounts this old complaint excepts “the regular semi-annual accounts, regularly made out in the business on the first of January *701 and the first of July in each year.” It then proceeded tosíate reasons why the executors believed that no other accounts had been rendered, among which was the fact that this surviving executor, although for some three years in the firm office, had never heard of any other accounts; and then states why they believed that no account had been made out “for the purpose of final settlement,” by which expression was meant an exhibit of the partnership affairs ■on the 1st of July, 1870, as the deceased died February 25, 1870. This old complaint, therefore, distinctly recognized the fact that a “regular semi-annual account” had been “regularly made out” on the 1st of January, 1870—some six weeks before the death of the deceased partner. It makes no allegation of error or fraud in this last, or indeed in any of these “regular semi-annual accounts,” unless, perhaps, it may be said that the ninth paragraph contains such a charge. It is there stated that, during the last year of the business, Masury had made extensive permanent improvements on the factory real estate, and charged them to the expense account instead of to the cost of factory, thereby throwing away those expenditures instead of preserving them as assets. But the trouble with this allegation was that it was not true.
The executor, himself, proved before the arbitrator that these expenses were charged to the factory account, on the books in such way that they were preserved as assets, and thereupon that allegation was wholly abandoned. It thus appears that the only allegation which, by any possibility, could be construed as an attack on these or any of these semi-annual accounts which were thus recognized as “regularly made out in the business ” was shown to be wholly untrue. This old complaint therefore alleged “regular semi-annual accounts,” which included the 1st of January, 1870, without any successful allegations that there was anything wrong in any of them. They were presumably correct as matter of evidence. Story on Part. (7th ed.), § 206; Parsons, 243; Lindley, 840; 3 Paige, 572. But that is not the point. The question under consideration relates to a matter ol pleading-, and, under the circumstances disclosed, it is well settled that if the old action had been tried on that ■complaint, unamended, no judgment for an account could have been rendered, except from and after January 1, 1870. 2 Bindley, 195; 1 Oolyer, 465, 610; Parsons, 522. It appeared by undisputed evidence that this $10,000 item for wear and tear was charged to profit and loss, prior to January, 1870, and was covered by the regular semi-annual account rendered as of that date. It was therefore not legally involved in that action.
It is not to the point to say that the evidence showed that *702 this last semi-annual account had not become an account stated. If Masury had set up this account as a defense, a different question would have been presented—one which would have been necessarily tried on the evidence, and we should then have been concluded by the arbitrator’s action, respecting it. But how could the plaintiffs in that action have been heard to question that account or have expected to succeed in obtaining an interloctory judgment that Masury should render an account of transactions prior to January, 1870, when their own pleading thus recognized the fact that he had already accounted for those transactions, especially when they made no truthful allegation of any error or fraud? Lindley, 975; 1 Colyer, 465, 510; Parsons, 522; 1 Story, Eq. Jur., § 523; 2 John Ch., 217; 15 Wend. 83; 2 Barb., 586.
We are not bound by the arbitrator’s conclusions respecting the extent of his authority. That is an open question which we are bound to examine and determine quite irrespective of the arbitrator’s views on the subject. Halstead v. Seaman, 82 N. Y., 27. The old complaint furnished the specification of his authority, and, as we have seen, it proceeded on the theory of the existence of, and failed to challenge the account which included this item of $10,000. Its only specification of wrong related to transactions which happened either on or after July 1, 1870, the day when the co-partnership business ended and when Masury took the assets to his individual account.
Quite a different question is presented by the item of $15,901.02, alleged under-valuation of merchandise. That was a matter which the arbitrator was undoubtedly authorized to examine. But a careful examination of the undisputed facts will demonstrate that he quite exceeded his authority in fixing the sum which he has charged against plaintiff for this cause. As already observed, the three agreements made by these partners were attached to and made a part of this old complaint in the action for an accounting. Hence, the arbitrator was bound by the true legal construction of these agreements quite as much as by the true legal construction of the allegations of the pleading in other respects. It was the pleading as a whole—the agreements taken as a part of it, which, with the stipulation, constituted and must indicate the extent of the arbitrator’s authority.
An examination of these agreements shows that the plaintiff was entitled to have, and was bound to account for these goods at one or the other of two standards of valuation: Either at the prices indicated by the last inventory preceding the death of deceased, for such part thereof as was covered by that document, and at the cost, *703 of such goods as were not covered thereby; or, at the cost “ wholesale purchasable market price ” of the entire stock at the time when the business was closed, July 1, 1870. It will not be important to determine which of these was the correct standard, for the reason that the undisputed testimony shows that the arbitrator did not apply either rule; on the contrary, he selected a standard which was wholly unwarranted by either, and then certified in his award that he had applied the one last indicated. I think it plain that the purpose of these agreements was, that the survivor should have these goods wholly free from the price or profit which the firm would have realized on the goods under the most favorable circumstances. In the first place, there was not the slightest evidence before the arbitrator which even tended to show that the sum which was entered on the inventory at the balance on July 1, 1870, when plaintiff took the business, varied in any particular from either standard predicable on the contracts. In the next place, it is beyond controversy that he assumed that the sum which plaintiff charged against himself was the cost of the goods, and that it was impossible for any person who had never seen the goods to fix any greater sum as the wholesale purchasable market value thereof. Then the fact, that every witness who testified about their value, from personal knowledge, said that they were over-valued by the plaintiff. The defendant called several witnesses who had assisted in selling these goods for plaintiff after he took them, and neither of them was even asked his opinion of their value. The only evidence submitted in behalf of the defendant touching the value of the goods, which by any possibility could have been used as a basis for the arbitrator’s finding, was given by an expert accountant named Goddard, who had examined the old firm books for some three years immediately prior to July 1, 1870, with the view of ascertaining the profit which the firm had realized on its sales; and he also examined the plaintiff’s sales book for some few months after, but not immediately after he had taken the goods to his own account, arbitrarily selecting the period, with a like purpose respecting the plaintiff’s sales. Having ascertained what he presumed to be a percentage of profit from these several sources,, he added that to the assumed costs of the goods with which plaintiff had charged himself, and called the result the wholesale market price of the goods, quite ignoring the fact which he undertook to look for, and which the arbitrator was bound to find—the “wholesale purchasable,” instead of the “wholesale salable market price.” I think, in one single instance, that this witness did refer to the result as the “wholesale purchasable market price;” but it is impossible that that *704 could have been the fact, because he has given his arithmetical processes, and they show that he took the salable price to the customers of the firm and of the plaintiff, respectively, including the profit, thus showing that he quite overlooked, or else intentionally ignored, the distinction between these two phrases—purchasable and salable.
It is equally clear that the arbitrator simply adopted this expert accountant’s theories and figures. The results stated in his award demonstrate this fact. The arbitrator, himself, on his cross-examination frankly admitted this fact; and the table of figures which he produced excludes the possibility of any other theory. We are thus brought face to face with a case where an arbitrator certifies in his award that he finds the “ wholesale purchasable market price ” of the goods to be a certain sum, when it is as certain as anything in human affairs can be, that he has adopted the wholesale salable and not the ‘ ‘wholesale purchasable market price.” It therefore follows as a necessary conclusion that his award is false in this material and vital particular, unless we are bound to adopt his construction of the contracts; and since they are a part of the complaint and therefore a part of the agreement which constitutes the submission to him, and since we are bound to construe that submission for ourselves, there seems no escape from the conclusion that the arbitrator exceeded his authority in applying any such rule of valuation, and that his award is void in this respect. Besides, to permit it to stand as to this item, involves a plain case of obvious injustice, in that, including interest, it would charge the plaintiff with the sum of $15,510.99, without the slightest foundation of legal liability. The result is a purely arbitrary one.
The setting aside of an award, under such circumstances, involves no attempt to exercise any general supervisory power over awards; but simply the judgment that the arbitrator has exceeded his authority, on the one hand, and been guilty of legal misconduct on the other. Certainly if he refused to take material and important testimony offered by the plaintiff respecting the value of this merchandise, it would have been misconduct. Van Courtland v. Underhill, 11 Johns., 405; Balstead v. Seaman, supra, Morse on A. and A., 539, 533. Is it any the less misconduct in the legal sense of the term, for an arbitrator to take, and then absolutely ignore important testimony? Nay, is it not infinitely worse, when the fact plainly appears, to disregard than to refuse to receive testimony by which he ought to have been controlled? In the former case his error if such it be, is remediable, while under the latter, the worst forms of injustice might be perpetrated without the possibility of redress. Such a result is not within either the letter or *705 spirit of the law. In Butler v. The Mayor, etc. (7 Hill, 332), Senator Bockee said: “ It would seem like a denial of justice where arbitrators have transcended the power and authority given them, that a party shall be precluded from giving proof and be bound to submit, merely because the arbitrators have not made such defective authority apparent on the face of the award. In my apprehension there is great danger and injustice in such a rule.” And he added that which is applicable with great force to this case: “If we
assume what was offered as true, the arbitrators have covered up some $8,000 or $9,000 under the vague and general terms used by them in the appraisement or award, and have in effect given judgment for that amount, etc.” The rule is well established that evidence aliunde the submission and award may be received to establish the fact that the arbitrator exceeded his authority in fixing sums to be paid even in cases which otherwise appear to be within his jurisdiction. Acts of that nature are sufficient evidence of misconduct. See authorities above cited, to which may be added, Morris Run Coal Co. v. Salt Co. (58 N. Y., 667), and Fudickar v. Guardian Ins. Co., (62 N. Y., 392).
I feel less hesitation in reaching this result because of the farther fact which also appeared by the undisputed evidence —that this executor, himself, being familiar, from his three years’ service in the store, with at least the selling prices of these goods, which he now seeks to charge upon the plaint-" iff, actually took the plaintiff’s figures indicating the prices which he proposed to charge against himself and made the extensions on the inventory, well knowing that the result was parried into the balance of the books; and he himself admitted that he never had the slightest cause to suspect the correctness or fairness of the accounts in any respect until the dispute about the Titterton mortgage arose, in August, 1875—which was over five years after these prices were thus fixed and long after the goods had been sold, so that it was no longer possible to obtain the testimony of disinterested parties respecting their value. And, besides, that there certainly was cogent evidence before the arbitrator which strongly tended to show, not only that these goods were over-valued, but that the plaintiff was compelled to throw away a large proportion of the whole stock as absolutely worthless, the fact being that they consisted of sealed packages, so that the contents of those thus lost could not be examined for actual quality when the plaintiff took them.
But these views cannot be applied to the last item—the matter of the Titterton mortgage. It seems that an old book-keeper had embezzled some $10,000 belonging to the *706 firm, and had succeeded in covering up his wrong until about six months after plaintiff had taken the business to his own account. On disclosure of this fact, the plaintiff, with the consent of the executor, took a mortgage on some property in Flatbush to secure the payment of that sum. It was arranged between them that this sum should be, and it was immediately, charged on the books to the estate of the deceased, it being intended that the plaintiff should assign the mortgage to the executors. Through some oversight the assignment was not made, and no attention was given to the matter by either party until August, 1875. This executor then wrote a letter to his lawyer saying that they had taken this mortgage as an investment on bond and mortgage for $10,000, and the mortgage was then assigned to the executors who brought suit for foreclosure, which resulted in a deficiency of some $13,000. The old complaint in the suit for an accounting charges that more than $5,000 was then due from plaintiff for deficiency on that mortgage. It was thus a claim within the letter of the submission. But the plaintiff insists that it was not legally involved in that action, because of the fact that the claim put by the old complaint was for a deficiency which, as he argues, necessarily involved an assignment of the security and a new agreement between the plaintiff and the executors in the nature of a guaranty of one-half the sum secured ‘ thereby. This would probably have been true were it not for the fact that the executor contended before the arbitrator and offered evidence tending to sustain the contention that the assignment was not taken as a payment, but only as a matter of convenience, it being all the while understood to be a firm asset. If that was the fact, the result was the same as if th'e plaintiff had continued to hold the mortgage, in which case the plaintiff and the estate would have borne the loss in equal shares. This claim was, therefore, within the authority of the arbitrator, and his finding in respect thereto is based on conflicting evidence and we cannot interfere with his disposition thereof.
This item seems to be easily and clearly distinguishable from the other, so that the award may stand as to this matter.
The conclusions reached on the other points do not involve any reflection on the motives of the arbitrator. In so far as the decision is placed on the ground of misconduct, it rests on the legal meaning of that term, which is not dependent in any sense on the motives of the arbitrator. Morse on A. and A., 534; Russell on Arbitration (3d ed), 654, 655; Phipps v. Ingram, 3 Dowl., 699.
The judgment should be modified by reducing the recovery to the following basis: The award should stand as *707 of the date thereof (January 26, 1886) at the sum which he finds due on the Titterton mortgage—$9,791.67, besides the $1,544.15 expenses and the $220 allowed as the costs of the old suit for the accounting—thus making in all the sum of $11,339.33. To this sum should be added interest from the date of the award to the entry of the judgment (October 4, 1886), amounting to $467.64, thus making in all $11,806.97.
The judgment should be reversed as to the excess over this sum. And since the plaintiff properly brought his action, and succeeds to the extent of such excess, no costs should be allowed to either party for the trial or upon this appeal.
The judgment, to the extent of costs, should also be reversed.